# 22-7

## United States Court of Appeals for the Second Circuit

ELISA W.; ALEXANDRIA R., by her next friend ALISON MAX ROTHSCHILD; THIERRY E., by his next friend MICHAEL B. MUSHLIN; LUCAS T., XIMENA T., JOSE T.C. and VALENTINA T.C., by their next friend RACHEL FRIEDMAN; AYANNA J., by her next friend MEYGHAN MCCREA; OLIVIA and ANA-MARIA R., by their next friend DAWN CARDI; XAVION M., by his next friend REVEREND DOCTOR GWENDOLYN HADLEY-HALL; TYRONE M., by his next friend BISHOP LILLIAN ROBINSON-WILTSHIRE

*(caption continued on next page)*

On Appeal from the United States District Court for the Southern District of New York

## BRIEF FOR CITY OF NEW YORK [FINAL FORM]

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for City of New York
100 Church Street
New York, New York 10007
212-356-2490 or -2502
jdavies@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
JAMISON DAVIES
*of Counsel*

July 19, 2022

Reproduced on Recycled Paper

BRITTNEY W., by her next friend, SHAMARA MILLS;
MIKAYLA G., by her next friend, MICHAEL B. MUSHLIN;
MYLS J. and MALIK M., by their next friend ELIZABETH
HENDRIX; and EMMANUEL S. and MATTHEW V. by their
next friend, SAMUEL D. PERRY, individually and on behalf
of a class of all others similarly situated,

*Plaintiffs-Appellants,*

*against*

THE CITY OF NEW YORK, SHEILA J. POOLE, ACTING
COMMISSIONER OF THE NEW YORK STATE OFFICE OF
CHILDREN AND FAMILY SERVICES, in her official capacity,

*Defendants-Appellees,*

*and*

NEW YORK CITY ADMINISTRATION FOR CHILDREN'S
SERVICES, STATE OF NEW YORK, NEW YORK STATE OFFICE
OF CHILDREN AND FAMILY SERVICES, and DAVID HANSEL,
COMMISSIONER OF THE NEW YORK CITY ADMINISTRATION
FOR CHILDREN'S SERVICES, in his official capacity,

*Defendants.*

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF THE CASE .................................................................. 4

    A.  New York City's foster-care system ........................................... 4

        1. The structure of New York City's foster-care system ............ 4

        2. ACS's efforts to achieve permanent placements for
           children in foster care ............................................................. 9

        3. ACS's supervision of Contract Agencies .............................. 12

    B.  The district court's two orders denying class certification ...... 14

STANDARD OF REVIEW  AND SUMMARY OF ARGUMENT ........... 18

ARGUMENT ......................................................................................... 23

    THE DISTRICT COURT CORRECTLY DENIED
    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION ............ 23

    A.  The district court correctly held that plaintiffs did not
        prove commonality. ................................................................. 24

        1. The challenged ACS practices yield no common
           question suitable for classwide resolution. ........................... 26

        2. A review of plaintiffs' four alleged practices confirms
           there is no common class question. ....................................... 31

        3. Cases applying *Wal-Mart*'s commonality analysis reject
           certification of classes raising general, systemic claims. ...... 37

i

# TABLE OF CONTENTS (cont'd)

**Page**

4. Plaintiffs cannot show commonality among class members based on risk of harm. ........................... 41

5. Plaintiffs' criticisms of the district court's decision fail. ...... 48

B. The district court correctly held that plaintiffs' claims are not typical. .................................................. 53

C. Plaintiffs and their counsel are not adequate class representatives. ...................................... 56

D. Plaintiffs' claims are unsuited to a Rule 23(b)(2) class............ 62

E. The district court did not err in failing to separately consider plaintiffs' proposed subclasses. ................................ 65

CONCLUSION ........................................ 69

CERTIFICATE OF COMPLIANCE ........................................ 70

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Ollie's Bargain Outlet, Inc.*,
  37 F.4th 890, No. 21-2121, 2022 U.S. App. LEXIS 17409
  (3d Cir. June 24, 2022) ....................................................................... 25

*Barrows v. Becerra*,
  24 F.4th 116 (2d Cir. 2022) .................................................................. 54

*Berni v. Barilla S.P.A.*,
  964 F.3d 141 (2d Cir. 2020) ........................................................... 62, 65

*Brown v. Giuliani*,
  158 F.R.D. 251 (E.D.N.Y. 1994) ......................................................... 55

*City of New York v. Maul*,
  14 N.Y.3d 499 (2010) ........................................................................... 53

*Connor B. v. Patrick*,
  774 F.3d 45 (1st Cir. 2014) ........................................................... 32, 41

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ....................................................................... 27, 28

*D.S. v. New York City Dep't of Educ.*
  255 F.R.D. 59 (E.D.N.Y. 2008) ........................................................... 60

*Davidson v. O'Reilly Auto Enters., LLC*,
  968 F.3d 955 (9th Cir. 2020) ............................................................... 37

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ......................................................... 32, 46

*Doe v. Cuomo*,
  755 F.3d 105 (2d Cir. 2014) ......................................................... 42, 43

*Doe v. New York City Dep't of Social Services*,
  649 F.2d 134 (2d Cir. 1981) ......................................................... 42, 43

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Ferreras v. Am. Airlines, Inc.,*
  946 F.3d 178 (3d Cir. 2019) ............................................................. 32

*Marisol A. ex rel. Forbes v. Giuliani,*
  126 F.3d 372 (2d Cir. 1997) ..................................................... *passim*

*Hansberry v. Lee,*
  311 U.S. 32 (1940) ........................................................................... 56

*Henrietta D. v. Bloomberg,*
  331 F.3d 261 (2d Cir. 2003) ............................................................ 28

*Hurd v. Fredenburgh,*
  984 F.3d 1075 (2d Cir. 2021) ......................................................... 43

*J.B. v. Valdez,*
  186 F.3d 1280 (10th Cir. 1999) ...................................................... 39

*J.H. v. Johnson,*
  346 F.3d 788 (7th Cir. 2003) .......................................................... 44

*Jamie S. v. Milwaukee Public Schools,*
  668 F.3d 481 (7th Cir. 2012) .................................................. 20, 38

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) ...................................................................... 62

*K.A. v. City of New York,*
  413 F. Supp 3d 282 (S.D.N.Y. 2019) .............................................. 45

*L.V.M. v. Lloyd,*
  318 F. Supp. 3d 601 (S.D.N.Y. 2018) ............................................ 55

*M.D. v. Abbott,*
  907 F.3d 237 (5th Cir. 2018) ...................................... 32, 39, 43, 44

*M.D. v. Perry,*
  547 F. App'x 543 (5th Cir. 2013) ................................................... 39

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*M.D. v. Perry,*
  675 F.3d 832 (5th Cir. 2012)...................................................... *passim*

*Norton v. Sam's Club,*
  145 F.3d 114 (2d Cir. 1998) ............................................................ 27

*Oklahoma City v. Tuttle,*
  471 U.S. 808 (1985)........................................................................ 34

*Parent/Professional Advocacy League v. City of Springfield,*
  934 F.3d 13 (1st Cir. 2019) ................................................... 20, 40, 41

*Parsons v. Ryan,*
  754 F.3d 567 (9th Cir. 2014)..................................................... 51, 55

*Parsons v. Ryan,*
  784 F.3d 571 (9th Cir. 2015) ........................................................... 51

*In re Payment Card Interchange Fee & Merch. Disc.*
  *Antitrust Litig.,*
  827 F.3d 223 (2d Cir. 2016) ............................................................ 57

*Phillips v. Sheriff of Cook County,*
  828 F.3d 541 (7th Cir. 2016)............................................................ 38

*Reynolds v. Giuliani,*
  506 F.3d 183 (2d Cir. 2007) ...................................................... 32, 44

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993) ...................................................... 54, 66

*Robinson v. Metro-North Commuter R.R.,*
  267 F.3d 147 (2d Cir. 2001) ............................................................ 18

*Scott v. Quay,*
  338 F.R.D. 178 (E.D.N.Y. 2021)....................................................... 45

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
806 F.3d 71 (2d Cir. 2015) ................................................. 29

*Matter of Sheila G.*,
61 N.Y.2d 368 (1984) ...................................................... *9*

*Taylor v. Zucker*,
No. 14-cv-05317, 2015 U.S. Dist. LEXIS 98877 (S.D.N.Y. July 27, 2015)................................................................. 49

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020)...................................................... 46

*Thomas v. City of New York*,
143 F.3d 31 (2d Cir. 1998) ............................................... 42

*Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n*,
852 F.3d 217 (2d Cir. 2017) ............................................. 56

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2009) ............................................. 29

*Wal-Mart v. Dukes*,
564 U.S. 338 (2011)................................................. *passim*

*Willis v. City of Seattle*,
943 F.3d 882 (9th Cir. 2019)............................................ 51

**Statutes**

28 U.S.C. § 2072(b)......................................................... 47

42 U.S.C. § 671(a)........................................................... 47

42 U.S.C § 675(5)............................................................ 58

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

N.Y. Fam. Ct. Act § 1022 ................................................................. 5, 6

N.Y. Fam. Ct. Act §1024 ................................................................. 5, 6

N.Y. Fam. Ct. Act § 1055(b) ................................................................. 8

N.Y. Fam. Ct. Act § 1089) ................................................................. 7

N.Y. Soc. Serv. Law § 384-b ................................................... 8, 57, 67

**Other Authorities**

22 N.Y.C.R.R. § 7.2(d) ................................................................. 61

Fed. R. Civ. P. 23(a) ................................................................. *passim*

Fed. R. Civ. P. 23(b)(2) ................................................................. *passim*

Fed. R. Civ. P. 23(c)(5) ................................................................. 66

Fed. R. Civ. P. 23(f) ................................................................. 17, 39

Fed. R. Civ. P. 23(g) ................................................................. 60

David Marcus, *The Persistence and Uncertain Future of the Public Interest Class Action*, 24 Lewis & Clark L. Rev. 395 (2020) ................................................................. 24

N.Y.C. Administration for Children's Services*, FY 2021 Foster Care Strategic Blueprint - Status Report* ................................ 4

U.S. Dep't of Justice, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees involving State and Local Governmental Entities* (Aug. 13, 2021) .................... 65

# PRELIMINARY STATEMENT

Plaintiffs, 19 children who have been in New York City's foster-care system, brought this putative class action on behalf of all children who are or ever will be in foster care in the City. They contend that the City's Administration for Children's Services (ACS) is deliberately indifferent to risks of harm to children in foster care, despite its attentiveness to systemic issues and unquestionably massive improvements over time. As a remedy, they request nothing less than a judicial takeover of foster care in the City, imposing numerous, costly obligations, and an ongoing monitorship with no defined conditions for success.

The district court denied an initial motion to certify a class, expressing doubt about the veracity of some allegations in the complaint and the extent to which plaintiffs' counsel was acting in the class's best interests. After extensive discovery, plaintiffs renewed their motion for class certification. The district court (Wood, J.) again declined to certify a class, concluding that plaintiffs' sweeping claims were not amenable to classwide resolution. This Court granted petitioners' request for leave to bring an interlocutory appeal. The Court should now affirm.

The district court correctly held that plaintiffs cannot show commonality or typicality as required by Rule 23(a). The gravamen of their suit is that ACS fails in four ways to ensure that the 26 nongovernmental agencies that administer the day-to-day operation of the foster-care system meet plaintiffs' preferred standards, and these failures in turn, through unspecified intervening steps, increase the risk that children will spend excessive time, or be maltreated, in foster care.

As the district court recognized, under plaintiffs' theory, there is no single failure of oversight by ACS, or experience of children in foster care, or causal pathway between the two, that is common to all members of the class. Plaintiffs challenge multiple alleged oversight failures by ACS without offering a means to identify which ultimately affected the experience of any given child in foster care. Plaintiffs also fail to account in any fashion for the significant role that distinct, non-party actors in the system—including, parents, children, their attorneys, New York Family Court's 47 independent judges, and state appellate courts—may play in how long a child remains in foster care and the child's experience while in care. Plaintiffs also concede that not every child in foster care experiences even one of the harms they allege.

2

While the district court did not reach the questions of adequacy or whether the class separately satisfied Rule 23(b)(2), each of those issues provides an independent basis for affirmance. The remedies that the named plaintiffs and their counsel seek would not benefit, and indeed would actively harm, a substantial portion of the class, creating intra-class conflicts that render them inadequate class representatives.

Plus, Rule 23(b)(2) classes like the one plaintiffs seek to certify here must be unitary, such that a single injunction would benefit every member of the class. Here, the requested relief would not benefit most of the absent class members, who would suffer from the diversion of resources away from actually assisting them in achieving permanent placements and toward increased paperwork and costly outside monitoring. Even more centrally, plaintiffs' insistence on speedier terminations of parental rights would likely harm the significant proportion of the class that would otherwise eventually be unified with their birth families—contrary not only to many class members' interests but also to state and local policies preferring family reunification.

## STATEMENT OF THE CASE

### A. New York City's foster-care system

#### 1. The structure of New York City's foster-care system

Plaintiffs' portrayal of New York City's foster-care system fails to account for marked progress made in recent decades—including during this action's pendency. While there is no doubt room for continued improvement, ACS responds to the types of now-outdated internal critiques on which plaintiffs rely and has implemented a number of new programs to address the multitude of issues affecting children, including programs to prevent children from entering the system in the first place, improving placements, and increasing reporting of maltreatment (*see* Joint Appendix ("A") 2885-2905). From 2006 to 2019, the number of children entering foster care declined by 51% (A2883).[1] The total foster care days for all children in care decreased from over 7 million in 2006 to 3.6 million in 2019 (*id.*). Between 2012 and 2018 there was a 40%

---

[1] ACS's most recent *Foster Care Strategic Blueprint* reflects that the average number of New York City children in foster care in 2021 reached a low and, as of January 2022, the number of children in foster care had dropped even further, despite ongoing challenges to the system related to the pandemic, including severe delays in Family Court. N.Y.C. Administration for Children's Services, *FY 2021 Foster Care Strategic Blueprint - Status Report*, *available at* https://perma.cc/4FYA-STKM.

4

decrease in the number of children in foster care for 12-23 months and a 38% decrease in the number of children in care for 24 or more months (A2883-84). In just two years, from 2017 to 2019, the length of stay in foster care declined by 50 days on average (A2884). Caseworker caseloads declined from an average to 18-20 to 10-12 per caseworker between 2014 and 2020 (A2886-87). In collaboration with the City University of New York, ACS has also developed numerous training courses and professional development opportunities in a variety of areas relevant to caseworkers (A2888).

With that more recent history in mind, we turn to a brief description of the City's complex foster-care system. The system is administered by the ACS, subject to significant review and oversight by the roughly 47 judges of the City's divisions of New York State Family Court in proceedings where parents and children appear, represented by their own attorneys.

ACS is responsible for investigating suspected child abuse and maltreatment and, where imminent risk to health or safety is identified, removing children, with pre- or post-removal review and approval by the

Family Court, from their parents or others legally responsible for their care who are accused of abuse or neglect. N.Y. Fam. Ct. Act §§ 1022, 1024.

Starting in 2009, ACS implemented an initiative called Improved Outcomes for Children (IOC) to delegate management of individual cases to private "Contract Agencies"—comprising another varied set of non-party actors who play a significant role in the system. ACS currently contracts with 26 Contract Agencies, which deliver the day-to-day services to children and families (A2882). The Agencies employ their own caseworkers, assuming primary responsibility for managing a child's case, with ACS exercising an oversight role and monitoring their performance through data metrics and regular permanency hearings in Family Court where ACS attorneys are present (*id.*).

Under the IOC initiative, ACS supports and intensively monitors the Contract Agencies (A2882-83). IOC delegates case management to the Agencies on the premise that case planners from agencies who are working with children and families on a daily basis are best placed to understand and address their needs.

Contract Agencies are responsible for monitoring children, ensuring that they receive needed services; recruiting, training, and

providing support to foster parents; ensuring that children have appropriate family time with their birth family; referring parents for services to facilitate safe reunification; and developing and implementing alternative permanency plans for adoption or placement with a relative when reunification cannot be achieved (A2883).

Beyond ACS and Contract Agencies, the judges of the New York Family Court engage in intensive and active supervision of each child's case. A child removed from parental custody remains under the Family Court's jurisdiction until achieving a permanent outcome. Within eight months of a child's removal, and approximately every six months thereafter, the Family Court holds a permanency hearing, where it examines progress toward a permanent placement, reviews any issues in the child's care, and issues any orders needed to assist in achieving a permanent placement for the child. *See* N.Y. Fam. Ct. Act § 1089(a), (c).

At each hearing, the court must issue an order explaining, among many other things, "whether the permanency goal for the child should be approved or modified and the anticipated date for achieving the goal" and "whether reasonable efforts have been made to effectuate the child's permanency plan," and including a notice that "if the child remains in

7

foster care for fifteen of the most recent twenty-two months, the local social services district or agency may be required by law to file a petition to terminate parental rights." *Id.* § 1089(d).

Extensive Family Court supervision and litigation often lengthens the time spent in foster care. Proceedings in Family Court tend to be highly contested. And, because parents and children are guaranteed counsel, and nearly every order in an abuse or neglect matter may be appealed, litigation may be protracted at both the Family Court and appellate levels (*see* A3125-32).

The express, codified policy of the City and State of New York is to reunify families whenever possible. New York's Social Services Law provides that "it is generally desirable for the child to remain with or be returned to the birth parent." N.Y. Soc. Serv. Law § 384-b(1)(a)(ii). ACS's "first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home." *Id.* § 384-b(1)(a)(iii). The State's Family Court Act expresses the same directive, explaining that the agency's "legal responsibility" is to "reunite and reconcile families whenever possible and to offer services and assistance for that purpose." N.Y. Fam. Ct. Act § 1055(b)(iii)(C). ACS cannot seek to terminate parental

rights unless it can "prove by clear and convincing evidence" that is exercised "diligent efforts to … reunite the family." *Matter of Sheila G.*, 61 N.Y.2d 368, 373 (1984).

While the goal is to rapidly achieve a permanent placement for any child who enters the foster-care system, the length of time to achieve that result for any child depends on a number of factors—all subject to Family Court review and approval, followed frequently by appellate review— including the parent's progress with offered services, the pace of Family Court litigation, appeals, and any number of other intervening events.

## 2. ACS's efforts to achieve permanent placements for children in foster care

When a child is placed into foster care, ACS seeks to make a placement that best meets his or her needs (A2889). ACS collects as much information as possible about the child and shares this information with the Agencies (*id.*). The information available varies based on factors unique to each child and family, such as the family's willingness to share information, the age of the child, and the existence of school and medical records (*id.*). ACS must also balance the inherent tension between

delaying a placement to collect more information and making a placement more quickly to reduce potential trauma to the child (A2890).

The general process for placing children uses a relatively new Placement Module, rolled out in 2019 to improve the placement process (A2892).[2] When children enter foster care, ACS Child and Family Specialists (CFS), licensed master's-level social workers and clinicians, interview the children (A2890). The CFS also conducts family team conferences, where information is gathered directly from the family; confers with child protection staff who conducted the investigation; and reviews all information that has been collected (*id.*).

Based on this review, the CFS determines what sort of placement will most appropriately meet the child's needs, including, for example, placements that offer specific psychiatric or medical treatment (A2891). All this information is incorporated into the Placement Module and a referral request goes out to all relevant providers (A2892). This allows a match between the child-specific information in the record with the characteristics that contracted foster-care providers have entered

---

[2] Notably, plaintiffs' discussion of ACS's placement practices relies on documents that predate the implementation of this system (Brief for Appellants 10-13).

describing the children or youths that foster parents are able to, and trained to, foster. These matching criteria include basic factors such as the child's age, sex, and school district as well as more detailed preferences, such as personal interests (*id.*).

When potential matches are identified, ACS communicates with Agencies to determine which potential placement will be the best match. In addition to considering factors such as keeping the child in his or her current school and close to where the child's parents live, other characteristics are also considered such as a foster parent's experience managing certain child behaviors or their connection to activities in which the child participates (*id.*). Through this process, ACS is able to identify foster homes that may be a good match and ultimately select the best match (A2892-93).

ACS's matching system was largely responsible for New York being ranked among the best performers on the federal government's measure for placement stability. Most children who enter foster care do not move to another placement (A2895). The majority of children who enter care remain in their schools of origin, an important factor in maintaining a child's mental well-being and development (A2895-96).

11

In accordance with state and local policies, one of ACS's central missions is to safely reunite families whenever possible. The majority of children who enter foster care return to their families (A2896). When reunification is not possible, ACS attempts to place foster children in other permanent settings, including adoption (*id.*).

### 3. ACS's supervision of Contract Agencies

While Contract Agencies have significant autonomy in their day-to-day operations, ACS also engages in extensive supervision. To start, ACS sets minimum caseworker qualifications and training requirements. Contract Agencies are contractually bound to hire case planners with a master's degree in social work or equivalent human-services graduate degrees, or, alternatively, case planners with a bachelor's degree and at least two years of relevant experience (A2924). ACS's contracts also contain topic-focused trainings that caseworkers must take (*id.*). Agencies may also provide their own programs or may participate in a training offered by the Council of Family and Child Caring Agencies (A2925). All staff and supervisors must be trained on mandated reporting of abuse or maltreatment each year and, as of July 2019, must take an intensive course on safety and risk (*id.*).

12

While the IOC delegates case management functions to the Contract Agencies, ACS expects, and monitors agencies to make certain, that sound and timely decisions are made regarding the safety, permanency, and well-being of children, and it holds agencies accountable for their performance (A2909). Adding another layer of accountability, one of the Family Court's independent judges reviews all significant case actions (*id.*).

ACS retains specific roles at key points in the case, including the initial assessment to determine the appropriate level of care and to match children to foster-care agencies and programs; the determination of whether a residential setting is appropriate for a child; monthly safety checks of provider agency programs; final authority for safety decisions at all ACS-facilitated conferences; and review of each agencies' permanency reports and any permanency goal changes (*id.*).

Beyond its direct responsibilities in each case, ACS operates a sophisticated and intensive oversight system for the Agencies (A2911). The system is designed both to hold Agencies accountable and improve in the quality of services (*id.*). This includes ongoing case reviews and a system for automatically investigating reports of alleged abuse or neglect

13

in a foster home (A2912). Reports of possible maltreatment involving a foster home or a child who is in foster care are investigated by a specialized unit within ACS. If an investigation finds credible evidence that supports the allegations, the investigative office has, and has exercised, the authority to direct the provider agency to close the foster home, remove children from the foster home, and issue corrective action plans to the Contract Agencies (A2918).

## B. The district court's two orders denying class certification

In 2015, plaintiffs filed this suit alleging that systemic deficiencies in the City's foster-care system deprive them of various constitutional and statutory rights (*see generally* A204-332). In particular, they contend that ACS has failed to ensure proper foster-care placements, failed to impose training requirements, and failed to timely file petitions for termination of parental rights, among other things (A295-317). Plaintiffs allege that these failures result in delays in achieving permanency and an increased risk of maltreatment for children in foster care (A284-94). To remedy those alleged harms, plaintiffs seek a judicial takeover of the City's foster-care system, requesting ten different forms of injunctive relief, including

appointment of a special master and an "[e]xpert [p]anel" to oversee compliance with their proposed standards (A326-30).

Shortly after filing their complain, plaintiffs moved to certify a class of all "children who are now or will be in the foster care custody of" ACS (A202). The district court[3] noted that evidence proffered by defendants called into question the "reliability of the specific factual assertions" in the complaint and whether plaintiffs' "broad assertions" about problems in the foster-care system are "central common factual issues that can be addressed with the sort of 'one-stroke' determination that is contemplated by the class action mechanism" (A479-80). Moreover, the court noted the "dearth even of allegations concerning case work and conditions at most of the separate third-party agencies" (A480). As the court explained, the "breadth of the common questions" undermined plaintiffs' ability to "demonstrate that certification of a broad unitary class of children who are or will be in foster care is appropriate" (*id.*). The court thus denied the class-certification motion without prejudice.

---

[3] Then-Chief-Judge Swain was presiding over the case at the time. The case was transferred to Judge Wood in July 2020.

15

After several years of discovery, plaintiffs renewed their motion, this time asking for certification of the same class of all the approximately children 8,000 currently in foster care (A2883), and any number of children who may enter care in the future, plus two subclasses of children allegedly subject to specific alleged practices (A602-03). The City, State, and organizations representing parents of children in the foster-care system opposed the motion (A3195).

In the order on appeal, the district court denied plaintiffs' renewed motion, concluding that plaintiffs had not demonstrated commonality or typicality under Federal Rule of Civil Procedure 23(a) (SPA16-24). As to commonality, the court explained that plaintiffs' proposed common questions are "too broad and generalized" (SPA17). Commonality requires a showing that plaintiffs have "suffered the same injury," which is distinct from merely alleging that they "suffered a violation of the same provision of law" (*id.*).

In this case, the court reasoned, there are "myriad reasons" that children might suffer a delay in their path to permanency, many of which are out of the control of ACS, and these wide-ranging causes preclude resolution of the claims "in one stroke" (SPA18). Likewise, the departures

16

from ACS policy on which plaintiffs base their purportedly common questions "are case-specific, stemming from the actions of individual case workers, individual Contract Agencies, or external factors (such as the New York State Family Court system)" (SPA19). The role of Family Court, in particular, creates dissimilarities within the proposed class that impede the generation of common answers (*id.*).

Turning to typicality, the court concluded that the reasons why a particular child might spend extended time in foster care meant that plaintiffs' claims cannot be said to arise from the same course of events as those of other children in the proposed class (SPA22). Instead, evaluating what happened to any given child requires consideration of "all of the other contributing facts and influences," including the availability of housing assistance, mental health treatment, and substance abuse counseling for the parents (SPA22-23).

After the district court's denied the motion, plaintiffs petitioned this Court for leave to pursue interlocutory review under Federal Rule of Civil Procedure 23(f), which this Court granted (A3383-84).

17

## STANDARD OF REVIEW
## AND SUMMARY OF ARGUMENT

District courts are "afforded substantial leeway in deciding issues of class certification," and the court's decision is reviewed for an abuse of discretion. *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 162 (2d Cir. 2001). Applying that standard, this Court should affirm. Plaintiffs show no abuse of discretion in the district court's finding that they failed to carry their burden of demonstrating that the proposed, exceptionally broad class of every child who is or ever will be in foster care met Rule 23's requirements.

To start, plaintiffs fail to establish the existence of common questions capable of classwide resolution. Plaintiffs challenge certain purported failures by ACS to oversee 26 Contract Agencies, primarily asserting substantive due process claims resulting in, they allege, a risk of delayed placement or maltreatment while in foster care. By their nature, such claims present judgment-laden and context-specific issues that are not easily resolved into any common question of law or fact.

The point is amply borne out here. There is no single point of failure, no cohesive experience of children in foster care, and no sufficient causal pathway between the two that is common to the class. Plaintiffs

18

challenge multiple alleged oversight failures by ACS without offering a means to identify which ultimately affected the experience of any given child. Plus, each case is influenced by the actions of numerous nonparties, including attorneys for parents and children in Family Court, Family Court judges, and the appellate courts that review their decisions. That multiplicity of reasons, coupled with the impossibility of tracing any injury to any particular ACS policy, and plaintiffs' failure to parse out, or even attempt to parse out, the contribution of other system participants to delays in permanency, defeats commonality across the sprawling proposed class. Moreover, plaintiffs concede that not every child in foster care experiences one, much less both, of the harms they allege.

Plaintiffs identify four ACS practices as their proposed common issues of fact. In truth, the challenged conduct consists of instances of alleged departures from ACS's stated policies or plaintiffs' preferred practices, which means that many of the children in the putative class are not subject to the alleged deficient practices at all. Plaintiffs attempt to pave over the fundamental lack of class commonality by recasting these scattered departures from ACS policy as a "practice of accepting" such departures does not create commonality where none exists. Several

courts of appeals have rejected similar attempts to bootstrap individualized claims into class actions. *See Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 31 (1st Cir. 2019); *DL v. Dist. of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013); *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 485-86 (7th Cir. 2012); *M.D. v. Perry*, 675 F.3d 832, 843-44 (5th Cir. 2012).

Lacking a common injury that a class action could redress, plaintiff assert that the alleged failures of oversight increased the *risk* of a longer-than-necessary stay in foster care or of maltreatment by a foster parent. But plaintiffs' invocation of an amorphous increased risk of harm does not meet their burden. They must show an actual injury. But if risk of harm were enough, plaintiffs still failed to show a direct causal link between the practices and a significant risk of harm. Instead, they merely assert that ACS has imperfect policies and that some—but not all—children experience harms, without showing that the risk of harm they allege is causally linked to the policies they challenge or universally experienced by all class members. Nor can plaintiffs' allegations of bare statutory violations as to only some members of the class hold the class together.

20

Similarly, plaintiffs' reliance on this Court's decision in *Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) (per curiam), a case at the "boundary" of class certification when it was decided, fails in light of the Supreme Court's intervening decision in *Wal-Mart v. Dukes*, 564 U.S. 338 (2011). As the Supreme Court made clear, recasting a number of disparate decisions made by any number of actors as a "practice" applicable to the class is insufficient to show commonality. *Id.* at 349-50. In addition, the abuse-of-discretion standard of review has the opposite valence here, since the district court denied certification in this case.

Of a piece with the lack of commonality, the named plaintiffs' claims and allegations are also not typical of the class they seek to represent. Plaintiffs represent only a small subset of the class and cannot show that their claims are typical of the entire, enormous class they seek to represent.

The district court decision may also be affirmed on two additional, independent grounds that the district court did not need to reach. First, plaintiffs and their counsel are not adequate class representatives. The relief they seek presents myriad intra-class conflicts, and the class-action mechanism is not an appropriate vehicle for imposing their vision of the

21

foster-care system over that of all other stakeholders, including New York State, which has rejected plaintiffs' drive to fast adoption by prioritizing family reunification even if that outcome might take longer.

Second, plaintiffs do not present the type of claim that can be resolved with a unitary injunction that benefits every class member, as Rule 23(b)(2) requires. Instead, some class members would not benefit, and some would even be harmed, by the injunctive relief plaintiffs seek. Most significantly, the relief sought would harm foster children who desire to be reunited with their families, since plaintiffs seek policy changes that would favor termination of parental rights and adoption. Quicker termination of parental rights only describes an outcome, not an unambiguous benefit. And New York law favors family reunification when possible. Plaintiffs' disagreement with state law does not entitle them to impose their view on absent class members who cannot opt out of any injunction they obtain.

Each of these defects, standing alone, would be fatal to plaintiffs' request for class treatment. Put together, these considerations demonstrate overwhelmingly that the district court did not abuse its discretion in denying class certification. Contrary to the alarmist

arguments of plaintiffs and their amici, affirming denial of certification of plaintiffs' sweeping class with its broad-brush, policy-driven approach to overhauling the foster-care system, would not imperil all class actions implicating the foster-care system or the government more broadly. Claims involving a truly common policy, and meeting *Wal-Mart*'s requirements, could proceed.

## ARGUMENT

### THE DISTRICT COURT CORRECTLY DENIED PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs bore the burden of "affirmatively demonstrat[ing]" by a preponderance of the evidence that their proposed class "*in fact*" met Rule 23's requirements. *Wal-Mart*, 564 U.S. at 350. The Supreme Court's decision in *Wal-Mart* makes clear that a court examining a class-certification motion must undertake a "rigorous analysis" before concluding that the prerequisites of every element of Rule 23 have been satisfied. *Id.* at 350-51. The requisite "rigorous analysis" will often "entail some overlap with the merits of the … underlying claim." *Id.* at 351. "*Wal-Mart*'s interpretation of Rule 23(a)(2) has changed the landscape" and renders some "pattern and practice claims" that would have met the

standard for class certification "prior to *Wal-Mart*" unsuitable for classwide determination. *DL v. Dist. of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013).[4] Applying that standard, the district court providently exercised its discretion in determining that plaintiffs had failed to carry their burden of proving entitlement to class certification.

### A. The district court correctly held that plaintiffs did not prove commonality.

The district court correctly reasoned that the proposed class of the 8,000 children who are in foster care and all children who "ever will be" in foster care lacked commonality (SPA9, 21). As the Supreme Court explained in clarifying Rule 23's commonality inquiry, it is not enough to identify some circumstance the members of the proposed class have in common, such as being in the foster-care system, because any "competently crafted class complaint literally raises common questions."

---

[4] Indeed, one of the two civil procedure professors supporting plaintiffs acknowledged that *Wal-Mart* had "its only real significance for cases challenging customs, practices, and patterns of conduct that add up to the systemic maladministration of government agencies" and that it has "indisputably impacted" cases like this one. David Marcus, *The Persistence and Uncertain Future of the Public Interest Class Action*, 24 Lewis & Clark L. Rev. 395, 399, 415 (2020). And, notably, the professors' brief does not take a position on the merits of plaintiffs' motion for class certification (Brief of David Marcus and Tobias Barrington Wolff 2).

*Wal-Mart*, 564 U.S. at 349 (cleaned up).[5] Rather, commonality requires plaintiffs "to demonstrate that the class members have suffered the same injury." *Id.* at 350 (cleaned up).

This common-injury requirement does not mean "merely that they have all suffered a violation of the same provision of law." *Id.* Instead, there must be a common contention that is capable of classwide resolution, such that its "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Thus, plaintiffs may not merely posit common questions that could, in theory, be amenable to classwide resolution, but must have "significant proof" that the specific practices they challenge "*in fact* cause" their injury. *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, No. 21-2121, 2022 U.S. App. LEXIS 17409, at *24 (3d Cir. June 24, 2022).

Plaintiffs fail to show that the purported ACS practices they challenge present common questions that can be resolved in "one stroke." Indeed, other courts of appeals have repeatedly upheld the denial of class certification in cases presenting analogous challenges to multiple agency

---

[5] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

polices on behalf of broad proposed classes without a sufficient causal link to the class's alleged injuries. Plaintiffs' attempt to establish commonality by relying on a mere risk of harm or bare violation of a statute without actual classwide injury is unavailing. Also unavailing are their attempts to avoid the clear import of *Wal-Mart* for this case.

### 1. The challenged ACS practices yield no common question suitable for classwide resolution.

Plaintiffs' theory is that ACS exercises deficient oversight of the 26 Contract Agencies, failing to adequately prevent the Agencies from departing from purported best practices or statutory requirements. Plaintiffs contend that four of ACS's alleged "practices" commonly affect the class: (1) making foster-care placements at Contract Agencies without adequate consideration of a child's individual needs and failing to ensure Contract Agencies have a process for matching children to homes; (2) failing to require minimum training for Contract Agencies' caseworkers; (3) accepting allegedly inadequate and untimely case plans from Contract Agencies; and (4) accepting allegedly deficient Contract Agency planning for permanency (Brief for Appellants ("App. Br.") 45-

46).[6] In turn, they contend that these alleged failures extend children's time in the foster-care system and the risk of maltreatment while in the system (*id.* at 1).

As plaintiffs acknowledge (*id.* at 32-33), commonality analysis requires an understanding of the nature of the underlying claims. At nearly every turn, plaintiffs frame ACS's supposed shortcomings in vague and general terms—alleging that ACS's performance is "inadequate" or "deficient" (*e.g.*, App. Br. 15, 18, 19). Moreover, the proposed class claims sound primarily in substantive due process, which requires plaintiffs to surmount the high hurdle of showing that defendants acted with conscience-shocking deliberate indifference and that their indifference was the proximate cause of plaintiffs' injuries. *See*, *e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).[7] Such a claim is necessarily context-dependent, because whether a given action

---

[6] Plaintiffs do not pursue on appeal two other purportedly common questions that they advanced below: "whether ACS exercises meaningful oversight over the Contract Agencies" and "whether ACS fails to protect children in its custody from an increased risk of maltreatment" (SPA17). Those arguments are therefore waived. *See*, *e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

[7] Plaintiffs also intermittently refer to their surviving statutory claims but, as discussed in more detail below (at 46-47) those claims fail to present a common question for similar reasons.

27

violates "substantive due process demands an exact analysis of circumstances." *Id.* at 850. Thus, where "the proposed class's substantive due process claims" require a showing that defendants acted with "deliberate indifference that 'shocks the conscience,'" there are almost necessarily "dissimilarities within the proposed class" requiring "individual analysis." *M.D. v. Perry*, 675 F.3d 832, 843-44 & nn.3-4 (5th Cir. 2012).

As plaintiffs agree (App. Br. 50), they must also show that the practices they challenge are the "proximate cause" of their claimed injuries. Their bid for class certification fails on that front as well. Proximate cause requires a showing that "a cause is a substantial factor in bringing about the harm" that is not "too remotely or insignificantly related to the harm to be a legal basis for liability." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278-79 (2d Cir. 2003) (cleaned up). Here, the decisions of intervening actors (which plaintiffs failed to acknowledge, let alone address, in their analysis of reasons for ostensible delays in permanency) and the difficulty of tracing any harm to any given challenged policy precludes a showing that any ACS practice is a substantial factor in harming a child. And this Court has vacated class

certification in cases where, as here, the plaintiffs' "theory of liability rests on the independent actions of third and even fourth parties," such as the Contract Agencies and Family Court, which "thwarts any attempt to show proximate cause through generalized proof." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134-35 (2d Cir. 2009) (cleaned up); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 90-91 (2d Cir. 2015) (where intervening decisions "could have been made for any number of a multitude of reasons" the court cannot infer that the defendants' actions were "a but-for cause (much less the proximate cause)" of the harm alleged "for each member of the putative class").

Thus, the highly attenuated causal chain from the various purportedly deficient aspects of ACS's oversight to the alleged harm precludes finding common questions of law or fact that can be resolved in one stroke. As the district court correctly recognized, given the nature of New York City's foster-care system, there are "myriad" factors affecting a child's experience in foster care or how long it takes for a child to receive a permanent placement, and many of those factors are "beyond the control of ACS" (SPA18). As the City demonstrated with expert evidence,

and the district court found, two features of the foster-care system most significantly complicate the inquiry. One is that day-to-day responsibility for oversight of children in foster care is in the hands of 26 Contract Agencies, not ACS (*id.* at 3-5, 21). The other is that Family Court judges play a pervasive role in foster care: the court exercises significant ongoing supervision of children in foster care, children and parents are guaranteed counsel in Family Court, and nearly every order a Family Court judge issues is appealable, resulting in often protracted litigation over placements and other case-impacting decisions (*id.* at 6–7, 19).

Particularly in light of these features, any alleged harm that a given child experiences may be traceable to a number of discretionary decisions made in the course of each child's case by parents, Family Court judges, and the children themselves. The differential effects wrought both by decisions made by parents, the Family Court, and the children combined with varying application of the practices plaintiffs challenge create "dissimilarities within the proposed class" that "impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350 (cleaned up); *see id.* at 352 (explaining that, without some basis for considering the "reasons for all

30

th[e challenged] decisions together," it will be impossible to "produce a common answer to the crucial question").

Plus, where, as here, plaintiffs challenge "multiple, disparate" practices, a claim that all of the practices led to the alleged harms cannot raise common questions, since there is no way to tell for every child which practice (or practices) mattered or who or what caused the alleged delay. *DL*, 713 F.3d at 128. As the district court found, it is simply "not possible to determine what caused a permanency delay, a specific placement, an untimely or poorly-conceived case plan, or an instance of maltreatment, without evaluating all of the other contributing facts and influences" (SPA22).

### 2. A review of plaintiffs' four alleged practices confirms there is no common class question.

Applying this reasoning to each of the four "practices" alleged by plaintiffs shows that none creates a common question. *First*, plaintiffs allege that ACS has a common practice of assigning children to Contract Agencies without adequate consideration of a child's individual needs (App Br. 46). But plaintiffs rely solely on years-old documents that do not reflect current practice (*see* App. Br. 11-13). ACS now has a highly

31

effective matching system in place, which also takes into account the need to avoid a lengthy delay before placing a child (*see* A2889-96).[8] Indeed, the new system was implemented largely in response to the types of concerns identified in the internal ACS documents plaintiffs rely on (A1810; 1927-28). *See M.D. v. Abbott* ("*M.D. II*")*,* 907 F.3d 237, 268-69 (5th Cir. 2018) (holding that efforts to remedy identified problems in the foster-care system preclude a finding of deliberate indifference); *Reynolds v. Giuliani*, 506 F.3d 183, 196 (2d Cir. 2007) (efforts to foster compliance with law preclude a finding of deliberate indifference).

Beyond this basic failure of proof, plaintiffs cannot show that ACS's purported policy of insufficiently matching children to foster-care placements causes a common injury to all class members. Indeed, for one named plaintiff, the expert report submitted in support of class certification conceded that she was placed with an "exceptionally strong foster parent" (A797). *Cf. Denney v. Deutsche Bank AG*, 443 F.3d 253, 264

---

[8] While plaintiffs complain that system was not in place at the time they filed their motion, the propriety of class certification is judged "at the time of class certification." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 184 (3d Cir. 2019). Indeed, the fact that agency practices continue to improve are among the "good reasons class-wide challenges" to foster-care systems "are difficult to bring successfully." *Connor B. v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014).

(2d Cir. 2006) (explaining that a class must "be defined in such a way that anyone within it would have standing").

*Second*, plaintiffs contend that ACS fails to require minimum training for Contract Agencies' caseworkers (App. Br. 45). Once again, the premise is wrong, since caseworkers must have a master's degree in social work or substantial prior experience, and ACS offers numerous opportunities for training in their work, plus required trainings on reporting requirements for children who may be maltreated (A2924-25). Plaintiffs merely disagree with the requirements ACS has imposed without even specifying what additional training would resolve the harms they allege.

Even taking the flawed assertion at face value, it would not establish a question capable of class resolution. Any given child may not have been harmed—or even affected by—a lack of (unspecified) mandated training, particularly given that many Contract Agencies provide supplemental training (A1356, 2925). This element makes classwide claims here unworkable and implausible. Moreover, tracing a purported lack of training to an incremental risk that a child's stay in foster care will be longer, or to an incremental risk of maltreatment,

would require consideration of the varying ways a purported lack of training might have eventually manifested in harm an individual child. *Cf. Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (holding allegations of a "nebulous 'policy' of 'inadequate training'" insufficient for municipal liability). It would also require separating out the influence of all the other factors that could have affected the foster-care placement and the time in foster care, including the intervention of the Family Court. And that inquiry is so child-specific that it could not yield a "common answer" for all members of the proposed class.

*Third*, plaintiffs allege that ACS fails to provide timely case planning, though the deficiencies they allege amount to, at most, departures from best practices (App. Br. 17-19). Indeed, plaintiffs' leadoff point is not even that documentation was insufficient, just that it was late—though there is no legal obligation to timely enter case entries and nothing to suggest late paperwork causes any specific harm. Plaintiffs' own documents show that progress notes for the named plaintiffs were entered in a timely fashion in the vast majority of cases (A644). Several of the other practices they identify, such as concurrent planning and special scrutiny for certain children (App. Br. 16), are not statutorily

34

mandated (A3132, 3150). Contract Agency case planning often meets those requirements in any event (*see*, *e.g.*, A3157, 3164, 3173, 3187).

More critically, occasional departures from plaintiffs' case-planning ideal are not a common question suitable for class resolution. Plaintiffs do not allege that every child in foster care has an inadequate or untimely case plan, nor could they. There are 26 independent Contract Agencies with disparate practices, and plaintiffs do not show that all of the agencies failed to provide timely case planning in each foster child's case as a result of a purported lack of ACS oversight. They also cannot trace any particular harm, such as maltreatment or a delayed permanent placement, specifically to allegedly inadequate case planning, especially on a classwide basis. Whether a child's case plan is adequate is a quintessentially individualized question, unsuitable for common resolution.

*Fourth*, plaintiffs allege that ACS has a "practice" of deficiently planning for the child's permanency, amounting to a practice of accepting deficient casework from Contract Agencies (App. Br. 19-22, 49). This argument, too, relies on years-old evidence that doesn't reflect current practice (A1939; 2212). And their argument begins with a significant

misstatement, claiming that the City lags the federal median by two years in achieving "permanency" (App. Br. 19). The document they cite refers to time to adoption, not permanency (A1972), and most children achieve permanency by being reunited with their families or placed with a relative (A2896, 2898). And, once again, plaintiffs do not allege that the permanency planning for all children is deficient or that every child is harmed by an alleged policy of accepting deficient permanency planning. The differences in permanency planning across the entire class, and whether any deficiencies cause an actual harm, preclude common resolution. Lastly, permanency involves the Family Court and its intervening decisions, so it is impossible to attribute the duration of a child's stay to the challenged practice.

As discussion of each "practice" shows, plaintiffs allege case-specific "departures from ACS policy," which are not amenable to classwide resolution (SPA18). But, plaintiffs object, they aren't really challenging "'departures from ACS policy'" (App. Br. 49 (quoting SPA18)). Rather, they challenge ACS's "practice of accepting" departures from policy (*id.*). Plaintiffs' discussion reveals why courts must apply the commonality requirements rigorously. By adjusting the level of generality at which

36

claims are framed, competent counsel can phrase almost any complaint such that it "literally raises common questions." *Wal-Mart*, 564 U.S. at 358. Merely re-packaging sometime departures from policy as a systemic "practice of accepting" departures is precisely the kind of artful pleading by counsel seeking to create illusory commonality that the Court in *Wal-Mart* rightly rejected. Indeed, even the existence of an *actual* policy that facially violates the law, as opposed to departures from policy, is not "proof that a class" was subject to an unlawful practice without "evidence that [the policy] was implemented" and injured the class. *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 968 (9th Cir. 2020).

### 3. Cases applying *Wal-Mart*'s commonality analysis routinely reject certification of classes raising general, systemic claims.

Like the district court here, several federal courts of appeals have vacated certification of classes or upheld denials of class certification in cases alleging broad, systemic institutional failures. The reasoning of those decisions strongly supports the district court's exercise of discretion here.

In *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012), the Seventh Circuit explained that the fact that "all the class

members have 'suffered' as a result of disparate" violations of the Individuals with Disabilities Education Act did not generate a common question for classwide relief because "resolving any individual class member's claim" would require "an inherently particularized inquiry into the circumstances of the child's case." *Id.* at 497-98. There, as here, "plaintiffs' claims appear to be based on multiple, disparate failures to comply with the [school district's] statutory … obligations rather than a truly systemic policy or practice which affects them all." *Id. at* 504-05; *see also Phillips v. Sheriff of Cook County*, 828 F.3d 541, 556 (7th Cir. 2016) (denying certification where, as here, analysis of class claim is context dependent).

Likewise, in *M.D. v. Perry*, 675 F.3d 832 (5th Cir. 2012), the Fifth Circuit analyzed a similar systemic challenge to a state's foster-care system on a substantive due process theory and explained that "the test for commonality is complicated where, as here, the proffered 'common issue' is a somewhat amorphous claim of systemic or widespread misconduct." *Id.* at 844 (cleaned up). And the "reciting of the word 'systemic' in mantra-like fashion does not overcome the prerequisites to class certification." *Id.*; *see also J.B. v. Valdez*, 186 F.3d 1280, 1289 (10th

38

Cir. 1999) ("We refuse to read an allegation of systematic failures as a moniker for meeting the class action requirements."). The plaintiffs there, like plaintiffs here, attempted to "aggregate several amorphous claims of systemic or widespread conduct into one 'super-claim.'" *Id.* In so doing, they sought to "stretch the notions of commonality" beyond recognition. *Id.* (cleaned up). Thus, the Fifth Circuit vacated the class certification and remanded to the district court for reconsideration in light of *Wal-Mart*.[9]

The D.C. Circuit has also applied *Wal-Mart*'s standard to reject class claims, again similar to those at issue here, alleging deliberate indifference to the plaintiffs' rights under the Individuals with Disabilities Education Act. *DL*, 713 F.3d at 122. As the court there held, the kinds of "pattern and practice" allegations that plaintiffs make here "speak[] too broadly" after *Wal-Mart*. *Id.* at 126. Indeed, the court's

---

[9] On remand, the district court recertified the class, and in a later appeal the court affirmed in part and vacated in part the district court's class-certification order. *M.D. II*, 907 F.3d at 271. Plaintiffs point out that the court there held the main class was properly certified (App. Br. 36). But the state missed its deadline to file a Rule 23(f) petition. *M.D. v. Perry*, 547 F. App'x 543, 544 (5th Cir. 2013). Then, on appeal after a final judgment, the state "waived" its "Rule-23 specific arguments." *M.D. II*, 907 F.3d at 270. Thus, the court had no occasion to consider the propriety of the class in detail, though it did decertify a subclass for failure to show "class-wide constitutional harm," despite concluding there "may be risks" associated with the policies applied to that subclass. *Id.* at 270-71.

39

description of the plaintiffs' claims there closely mirrors the claims here. The court explained that for some plaintiffs "the alleged harm suffered is due to the failure of the District to have an effective intake and referral process," for others "the alleged harm is caused by the District's failure to offer adequate and timely education placements," and "for still others the cause is the absence of a smooth and effective transition from early intervention programs to preschool programs." *Id.* at 128. Those disparate sources of harm precluded commonality. *Id.*

The same is true of plaintiffs' claims: for some children, the alleged harm is caused by making a placement without adequate consideration of child's needs, for others it is providing inadequate case planning, and for still others it is failing to require minimum training for caseworkers. And here the claims are even more abstracted because plaintiffs do not link the practices they deride to any specific, concrete harm (*see infra* 43-47).

Finally, in *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019), the First Circuit held that a class of students with mental-health disabilities lacked commonality for similar reasons. *Id.* at 17. There, as here, the plaintiffs could not show

40

that any given practice they alleged was the "driver" of the "legal harm common to the class." *Id.* at 30. As here, the question of whether the challenged practices lead to a common legal harm requires "individualized determinations which defeat commonality." *Id.* at 31.[10]

### 4. Plaintiffs cannot show commonality among class members based on risk of harm.

Plaintiffs try to overcome their conceded inability to show each member of the proposed class shares an actual common injury (App. Br. 42) by asserting, for their substantive due process claim, that all class members experienced a heightened *risk* of harm (App. Br. 34). They make a similar move as to their handful of surviving statutory claims, suggesting that ACS violated statutory obligations to all class members, even if not all class members were injured as a result. These maneuvers do them no good because neither a risk of harm nor allegations of a bare statutory violation is enough to make out claims for the class as a whole.

---

[10] Further, while the issue of class certification was not before the First Circuit in *Connor B.*, the court there also sounded a skeptical note about claims like plaintiffs'—brought by the same counsel involved here—in the course of dismissing those claims on the merits. 774 F.3d at 55. The court explained that plaintiffs' attempt "to take aspirational statutory, regulatory, and private standards as to a variety of topics within the overall complex of foster child care and convert each of them to constitutional requirements" was "correctly rejected." *Id.*

First, proof of a deprivation of substantive due process requires a showing of tangible injury, not a mere risk of harm. This Court has required proof of injury to sustain a substantive due process claim. *See Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) (upholding dismissal of substantive due process claim where plaintiff "failed to allege any injury" as the result of the violation); *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir. 1998) (explaining that substantive due process claims survived because they "allege a present hardship that results directly" from the challenged action). Conduct that increases the risk of harm, without actually causing it, is not enough.[11]

For the contrary proposition that increased risk of harm is sufficient, plaintiffs cite *Doe v. New York City Dep't of Social Services*, 649 F.2d 134 (2d Cir. 1981). There, this Court indicated that a defendant can be liable for deliberate indifference to a "known risk." *Id.* at 145. But, in that case, the risk to the plaintiff materialized, and the agency had

---

[11] Plaintiffs attempt to support their risk-of-harm theory by reference to *Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 732 (2d Cir. 1997) (App. Br. 34-35). But the Court there, although upholding certification of a class premised on the theory that certain challenged policies placed foster children at risk of harm, did not endorse the proposition that a risk of harm was sufficient to establish a common injury for purposes of Rule 23 commonality. It does not appear that this question was even raised on appeal.

previously "expressed suspicion" about potential abuse of the foster child and failed to conduct a thorough investigation. *Id.* at 137-39. Deliberate indifference essentially served as a theory of supervisory liability—a basis to hold the defendants liable even though they did not directly commit the injurious abuse. *Doe* does not stand for the proposition that criticism of an agency's policy, along with a bare allegation that the policy exposes children to a risk of harm, is sufficient to make out a substantive due process claim. Plaintiffs' reading would dramatically undercut the "high standard" of a substantive due process claim. *Hurd v. Fredenburgh*, 984 F.3d 1075, 1089 (2d Cir. 2021).

Even if risk of harm were sufficient, plaintiffs fail to plausibly identify a sufficiently substantial degree of risk or to trace any specific causal link to the various challenged ACS practices. As one of the cases on which plaintiffs rely explains, there must be a demonstrable "direct causal link" between the challenged policy and the increased risk using a "high threshold of proof." *M.D. II*, 907 F.3d. at 253 (cleaned up); *see also Reynolds*, 506 F.3d at 193 (explaining that *Monell* claims are subject to a "rigorous … causation standard"). General "allegations of systemic risk are insufficient." *J.H. v. Johnson*, 346 F.3d 788, 795 (7th Cir. 2003)

(dismissing claim that foster-care agency was deliberately indifferent to risk of abuse in placement). Thus, it is not enough for plaintiffs to argue, as they do, that ACS has some imperfect policies and that members of the proposed class are at risk of one or more harms as a result. Plaintiffs must show the increased risks of significant harm they allege that are *specifically attributable* to challenged policies are sufficiently substantial. *See M.D. II*, 907 F.3d at 252.

They cannot do so. Plaintiffs assume throughout that any delay in permanency is always a harm (App. Br. 7), and thus any risk of delay is a necessary risk of harm. But that is simply not so. Unlike cases on which they rely, where there was an obvious harm attributable to the challenged policy, extended time in foster care is not necessarily a harm at all, much less an imminent and substantial one, for all children in foster care. In many cases, that extended time reflects efforts to enable children to reunite with their birth parents, and may result in the preferable outcome of family reunification, rather than termination of the birth parents' rights (A2928-29). In contrast, one of plaintiffs' key cases, *B.K. v. Snyder*, involved things like a "failure to provide timely access to

44

health care," which is necessarily harmful to anyone who experiences it. 922 F.3d 957, 969 (9th Cir. 2019).[12]

Plaintiffs also cannot show that the challenged practices cause a substantial increased risk of maltreatment. Plaintiffs allege an unspecified, marginal increase in the absolute risk that a foster parent will mistreat a foster child but do not show that the challenged practices are the source of that risk or that any incremental risk is, in fact, substantial. Indeed, plaintiffs make no attempt to quantify the increased risk of maltreatment that they claim flows from the challenged practices.[13] If alleged elevated risk is to be deemed a cognizable injury for the purpose of substantive due process claims, it is crucial to hold plaintiffs to the requirements of plausibly pleading the substantiality of

---

[12] Plaintiffs also cite several inapposite cases for their risk theory. The only decision from this Court, *Amador v. Andrews*, concerned whether the named plaintiffs' claims were moot, not whether class claims satisfied commonality. 655 F.3d 89, 101 (2d Cir. 2011). And the district court decisions involved claims without the same requirements as plaintiffs' substantive due process claim here. *See, e.g.*, *K.A. v. City of New York*, 413 F. Supp 3d 282, 297 (S.D.N.Y. 2019) (claim for "inadequate medical care"); *Scott v. Quay*, 338 F.R.D. 178, 187 (E.D.N.Y. 2021) (common law negligence).

[13] Plaintiffs' reliance on the total number of instances of maltreatment in care ignores the fact that most of those incidents occurred during visitation and trial discharge— *i.e.*, with the birth family—and are thus unrelated to foster placements (A2919). They also effectively penalize ACS's recent efforts to ensure broader reporting of suspected maltreatment, since other jurisdictions are likely to have less comprehensive reporting (*id.* at 16).

45

the risk and specifying a causal connection between the heightened risk and challenged practices. Otherwise, alleging "risk" will become a tactic for laundering speculative and conclusory pleading, as here.

Second, plaintiffs' statutory claims require proof of harm. Plaintiffs do not contend that these claims can proceed on their risk-of-harm theory (*see* App. Br. 34 (arguing only that "substantive due process claims" may be premised on risk of harm)). But they make the analogous assertion that a bare statutory violation is actionable even in the absence of a resulting injury. The Supreme Court, however, has "rejected the argument that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020) (cleaned up). Instead, plaintiffs must allege "a concrete injury even in the context of a statutory violation." *Id.* at 1620-21 (cleaned up); *see also Denney*, 443 F.3d at 264 (class must "be defined in such a way that anyone within it would have standing").

Plaintiffs do not, and cannot, contend that every member of the class has suffered injury due to an identified statutory violation, a failing that itself defeats commonality. The only statutory claims under the

46

Adoption Assistance and Child Welfare Act that survived defendants' motions to dismiss involve a right to the "preparation of a written case plan" and to a case review system (A466-72). Undisputedly, these procedural rights were met for at least some class members, if not the overwhelming majority.[14]

It makes no difference that plaintiffs attempt to assert classwide rather than individual claims. The class action device cannot be used to create new claims or causes of action, but only to assert existing ones. Indeed, the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b); *see also Wal-Mart*, 564 U.S. at 366 (holding class cannot be certified that would alter defendants' substantive rights). Plaintiffs' failure to show a common injury defeats commonality as to all of their claims.

---

[14] Plaintiffs also improperly attempt to smuggle in claims that were previously dismissed. For example, plaintiffs contend that the alleged systemic placement practice violates 42 U.S.C. § 671(a)(10), and that case plans must be "adequately implemented" (App. Br. 46, 48). But the district court dismissed their claim "premised on 42 U.S.C. § 671(a)(10)" and held that they had no private right to enforce "implementation" of a case plan (A469-70, 477).

47

### 5. Plaintiffs' criticisms of the district court's decision fail.

Plaintiffs raise a series of objections to the district court's faithful implementation of the Supreme Court's decision in *Wal-Mart*. None succeeds. First, they rely on this Court's decision in *Marisol A.* There, this Court affirmed certification of a class of children—though still narrower than the proposed class here—who were or would be in ACS's custody because of abuse or neglect reports or who were at risk of abuse or neglect and whose status should have been known to ACS. *Marisol A.*, 126 F.3d at 375. Despite affirming the order certifying the class, the Court recognized that the "generalized characterization of the claims raised by the plaintiffs stretches the notions of commonality and typicality" and that the "district court is near the boundary of the class action device." *Id.* at 377.

The Supreme Court's subsequent decision in *Wal-Mart* clarified that such a broad and generalized class is not near that boundary, but instead beyond it. As the district court observed, "'it is highly doubtful that the class [certified in *Marisol A.*] would be certified today'" (SPA23 n.10 (quoting *Taylor v. Zucker*, No. 14-cv-05317, 2015 U.S. Dist. LEXIS 98877, at *31 (S.D.N.Y. July 27, 2015)); *see M.D.*, 675 F.3d at 848 n.8

(noting that *Marisol A.* both "acknowledge[d] that the proposed class stretche[d] the notions of commonality and typicality," and "was decided before the Supreme Court's opinion in *Wal-Mart*" (cleaned up)).[15]

In any event, *Marisol A.* arose in the opposite posture—there, the lower court had granted class certification. The deference working in the plaintiffs' favor was crucial to the Court's analysis: the decision explained that a class-certification decision "will be overturned only if the district court abused its discretion," even stressing the appellate court "must exercise even greater deference when the district court has certified a class." *Marisol A.*, 126 F.3d at 375. Even under that highly deferential standard, and even before *Wal-Mart*, this Court still concluded that the class was at the outer limits and could not survive without subdivision. *Id.* Here, by contrast, the district court denied certification, and deferential review cuts for defendants.

Beyond *Marisol* and *M.D.*—which, for the reasons discussed above, (*see supra* n.9), does not fully endorse their theory—the only other

---

[15] Despite plaintiffs' attempt to distinguish it (App. Br. 40 n.21), *Taylor* tracks their claims: the alleged "wrongs done" to each plaintiff were the same and determining whether and how they had been harmed required individualized analysis involving consideration of non-defendants' actions. *Id.* at *6-7, 23-24.

49

decision of a court of appeals that plaintiffs cite for this point is *B.K.* (App. Br. 36). There, the Ninth Circuit explained that "commonality cannot be determined without a precise understanding of the nature of the underlying claims." 922 F.3d at 968 (cleaned up). And the challenged practices there had a much more direct relation to the potential injury to the class, including failure to provide timely access to health care, failure to investigate reports of abuse, and overuse of congregate care, none of which are at issue here. *Id.* at 969.

Here, as discussed, plaintiffs fail to link their purported common questions to the constitutional claim they press, instead relying on a more generalized "increased risk of harm" (App. Br. 34). Further, the Ninth Circuit's analysis was circumscribed by the fact that the defendants did not "seriously dispute" the appropriateness of class certification and instead were challenging the validity of a prior decision

by which the panel was bound, *Parsons v. Ryan*, 754 F.3d 567 (9th Cir. 2014).[16]

Plaintiffs next contend that the district court misapplied the Supreme Court's decision in *Wal-Mart* (App. Br. 38-41). Again, plaintiffs repeat their watchword that they are challenging "systemwide practices" and, therefore, *Wal-Mart*'s strictures are inapplicable to their claims (App. Br. 38 (emphasis removed)). But, in fact, the Supreme Court's analysis tracks closely onto their claims. Like the plaintiffs in *Wal-Mart*, plaintiffs here contend that the City has various "practice[s]" that injure the class. *Wal-Mart*, 564 U.S. at 533. But, as the Court there held, the mere allegation of a practice was not enough to render the class claims common. *Id.*

Plaintiffs argue that the key difference is that the Title VII claims in *Wal-Mart* required significant proof of a general policy of

---

[16] Notably, six Ninth Circuit judges voted to review *Parsons* en banc—even after the defendants withdrew their rehearing petition—citing its "defiance of [Wal-Mart]" and "serious misinterpretations of Supreme Court … class action jurisprudence." *Parsons v. Ryan*, 784 F.3d 571, 573 (9th Cir. 2015) (Ikuta, J., dissenting from denial of rehearing en banc). And that court has since pared back similar claims, including where class plaintiffs failed to show they all "experienced the same challenged practice or suffered the same injury" or that any "alleged practice" affected them all, and instead argued, as here, that the entire class was "at risk." *Willis v. City of Seattle*, 943 F.3d 882, 885, 887 (9th Cir. 2019).

discrimination, and their § 1983 claims require them to show only an increased risk of harm. But, as discussed above, at a minimum, their claims require a direct causal connection to a substantial and imminent risk of harm (*supra* 43-47). Thus, they face comparable hurdles to those the proposed class in *Wal-Mart* could not meet.

Plaintiffs also criticize the district court for its purported failure to properly consider the alleged practices affecting the class (App. Br. 44-52). Their arguments here are merely a repackaged version of their risk-of-harm arguments: They contend that they are not challenging the outcome of any particular child's case, but instead allege systemic failures. But "reciting of the word 'systemic' in mantra-like fashion does not overcome the prerequisites to class certification." *M.D.*, 675 F.3d at 844 (cleaned up). Instead, plaintiffs must show that the common questions they propose are apt to drive common answers that would determine liability on a class-wide basis. As discussed above, they do not.

Finally, contrary to the arguments of amici (Brief for Legal Aid Society et al. 9-10), affirming the district court's commonality analysis would not doom all class actions aimed at achieving reform of the foster-care system. Plaintiffs here seek to challenge purported failures of

oversight that affect children in foster care in nonuniform ways. That runs afoul of the heightened standards of *Wal-Mart* by trying to achieve certain attenuated outcomes through a broad-brush class action focused on upstream oversight. Indeed, the cases on which Legal Aid relies (*id.* at 9), challenged much more specific policies on behalf of much more targeted classes. *See*, *e.g.*, *City of New York v. Maul*, 14 N.Y.3d 499, 513 (2010) (explaining that the case "presents narrower and more discrete common questions in contrast to the broader issue of systemic failure" in *Marisol A.* and the proposed class would have fewer than 200 members).

## B. The district court correctly held that plaintiffs' claims are not typical.

The district court also correctly held that plaintiffs' claims are not "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As the district court held, while "the highly individualized nature of any child's case is relevant to commonality, it also is particularly salient to the typicality requirement, highlighting the inability of the named Plaintiffs to be typical representatives of all children in foster care now or in the future" (SPA22).

Typicality requires "that the claims of the class representatives be typical of those of the class" and it is "satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022). While "minor variations in the fact patterns" underlying individual claims do not defeat typicality, the named plaintiffs must allege that they were subject to "the same unlawful conduct." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

But the named plaintiffs' claims are not merely minor factual variations or differences in harms arising from the same course of conduct. Instead, as the district court observed, "because it is not possible to determine what caused a permanency delay, a specific placement, an untimely or poorly-conceived case plan, or an instance of maltreatment, without evaluating all of the other contributing facts and influences" the plaintiffs' claims cannot fairly be said to "arise from the same course of conduct" because the relevant course of conduct is entirely different in each case (SPA22-23).

54

Here, plaintiffs do not even argue that each named plaintiff was harmed by at least one of the "practices" they allege, and they have no account of the practices at over half of the Agencies (SPA21). Nor do they explain how the named plaintiffs' harms flow from the alleged violations. Instead, they rely on cases where a plaintiff may have suffered a different injury because of the application of the same policy, but where the policy was the clear source of the plaintiff's injury, and it applied the same way to all plaintiffs (App. Br. 55). So for example, in *Parsons*, each plaintiff was subject to failures in the provision of medical care, though not all had the same injuries as a result. 754 F.3d at 664, 686. Moreover, there, the Ninth Circuit held that "every inmate" was likely to need medical care at some point. *Id.* at 686. Here, plaintiffs do not and cannot allege that every child is likely to be harmed by the practices they identify. Likewise, in *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018), every plaintiff was subject to a delay in release, though the length of the delay varied among plaintiffs. *Id.* at 614, 616; *Brown v. Giuliani*, 158 F.R.D. 251, 268 (E.D.N.Y. 1994) (same as to delay in welfare payments).

The problem here is not that plaintiffs' alleged injuries vary— though they do—but that the entire "course of conduct" alleged varies

throughout the class. Fed. R. Civ. P. 23(a)(3). Thus, as the district court found, there was simply "no basis to conclude that each member's claim arises from the same course of events, or arises from system-wide policies and practices that apply to all other members of the class" (SPA23).

## C. Plaintiffs and their counsel are not adequate class representatives.

While the district court did not reach the question of adequacy (SPA16), this Court should also affirm on the basis that plaintiffs are not adequate class representatives. *Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 220 (2d Cir. 2017) (the court "may affirm on any basis supported by the record"). Rules 23(a)(4) and 23(g)(4) require, respectively, that the named plaintiffs and class counsel "fairly and adequately represent the interests of the class." These adequate-representation requirements reflect the fact that "members of a class not present as parties" may nonetheless be "bound by the judgment." *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). Thus, for any classwide resolution to comport with due process for the absent parties, the representatives' adequacy of representation must be assessed along with

any "intra-class conflicts." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 236 (2d Cir. 2016).

The relief requested by named plaintiffs and their counsel here is rife with the potential for "intra-class conflicts." *Id*. All children who are or ever will be in foster care are going to have any number of differing interests. To take one example, plaintiffs' counsel urge that petitions to terminate parental rights be filed and resolved more quickly than the Family Court judges presiding over permanency hearings appear to think appropriate—advancing interests favoring terminating parental rights and adoption over reunification with birth parents (A329). That position undermines the interests of absent class members who would not seek or benefit from such aggressive terminations, not to mention their parents. Nor does plaintiffs' policy view accord with New York's stated legislative preference for reunification if at all possible, with terminations of parental rights as an absolute last resort. *See* N.Y. Soc. Servs. Law § 384-b(1)(a)(ii)-(iv).

Beyond absent class members, plaintiffs' counsel's positions are hostile to the interests of at least some of the named plaintiff children. Of the named plaintiffs put forward as representative of the "Compelling

Reasons" subclass—a proposed subclass purportedly injured because termination of parental rights petitions were not pursued aggressively— six of these children were ultimately reunited with their birth mothers (A3036). Further, three of the children put forward as class representatives for this subclass were placed in care with relatives— commonly referred to as "kinship care" (A3159-60). The requirement to file a petition to terminate parental rights or document compelling reasons for not doing so does not even apply to children in kinship care. *See* 42 U.S.C. § 675(5)(E)(i); N.Y. Soc. Servs. L. § 384-b(3)(*l*)(i)(A). Thus, plaintiffs' counsel did not even bother to confirm that their purported subclass representatives were *members* of the subclass, let alone adequate representatives.

More broadly, as many as one-third or more of the absent class might well disagree with plaintiffs' counsel's demand for early petitions for termination of parental rights. In 2017, a third of the children for whom the filing of a termination petition appeared to be overdue were discharged from care within the next twenty-four months either to reunification to their birth parent or to kinship guardianship (A2928-29). It seems doubtful that these children would agree with plaintiffs'

58

counsel's position of speeding petitions to terminate their parents' rights and move to adoption, instead of a longer road to reunification with family or relatives, simply because a compelling reason or an exception is not documented in a case file.

Plus, early in the litigation the district court expressed concern about "the veracity of some of the factual allegations in the Amended Complaint" and the degree to which the complaint's claims "reflect the perspective of the named Plaintiffs and those who have represented them, as opposed to the views of other stakeholders … whose interests may not be entirely consonant with those of the named [p]laintiff children" (A479). Many of the named plaintiffs' next-friend representatives have had no contact with the child whose "best interests" they purport to represent (A237, 241, 243-44, 246, 253, 257).

As the litigation wound on, class counsel did nothing to dispel this concern. Nor did they eliminate doubt that class counsel may be driven by the interests of "other stakeholders," including plaintiffs' counsel who had initiated numerous similar lawsuits advancing their own policy preferences, rather than the true interests of the named plaintiffs, let alone absent proposed class members. But class counsel must, under

Rule 23(g), represent the "interests of the class," not outsiders with a policy agenda. The rule ensures that plaintiffs "are not simply lending their names to a suit controlled entirely by the attorneys for the benefit of counsel." *D.S. v. N.Y.C. Dep't of Educ.* 255 F.R.D. 59, 72 (E.D.N.Y. 2008) (cleaned up). Indeed, entities who actually represent both children and parents in the foster-care system opposed plaintiffs at multiple steps (A333-401, 413-34, 3195).

On this basis of these concerns, the City moved to dismiss many of the next friends purportedly acting in the named plaintiffs' best interest (S.D.N.Y. ECF No. 363). While the district court, on the report and recommendation of a magistrate judge, denied the City's motion, the report and recommendation noted that it is "counter-intuitive" that the claim could be brought without the next friends "ever having had any contact" with the named plaintiffs and without any "first-hand knowledge" of their desires or sentiments (A590). And, while the pertinent standards differ, it is worth noting that in the Family Court system that class counsel seeks seek to upend, counsel representing a child would have had to meet a much higher standard for engaging with the subject child and advancing the child's articulated position. *See* 22

60

N.Y.C.R.R. § 7.2(d)(1)-(2). Indeed, when plaintiffs' counsel spoke with attorneys who actually represented thirteen of the named plaintiffs in their Family Court proceedings, none agreed to participate in this suit, which suggests that advocates who are legally obliged to act in the named plaintiffs' best interest disagreed with class counsel's conception of those interests (*see* A486).

Nor can counsel salvage the action by suggesting that they seek only to enforce legal obligations as to which there cannot be a conflict within the class. One need only look at their wide-ranging request for injunctive relief, including enjoining ACS from placing foster children in any number of Contract Agencies, the indefinite installation of a special master and "expert panel" as court-appointed superintendents of the foster-care system, and requirements to produce reams of additional paperwork, to see that the remedies they seek would benefit different class members differently, benefit some not at all, and work active harm on others (A326-30; *see also infra* 62-65).

### D. Plaintiffs' claims are unsuited to a Rule 23(b)(2) class.

The district court also opted not to reach the issue of whether plaintiffs met Rule 23(b)(2)'s stringent requirements (SPA16), but this presents yet another clear, independent basis for affirmance. The rule requires that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The key to a 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted." *Wal-Mart*, 564 U.S. at 360 (cleaned up). The alleged conduct must be such that it can be "enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (cleaned up). Thus, the plaintiff must show that "a single injunction or declaratory judgment would provide relief to each member of the class." *Id.*; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (explaining that a 23(b)(2) class may not be certified where "some members … may not be entitled to" the requested relief). It "cannot be the case that some members" of the class receive "no benefit" from the requested injunction while others "receive some." *Berni v. Barilla S.P.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020). If the class seeks relief that may not benefit some members—or, worse still, may benefit some members at the expense of

others by diverting resources to problems that do not trouble some class members—then the class must not be certified.

Here, plaintiffs do not even allege that every class member suffered an injury, let alone any one that could be remedied by a single injunction or declaration. They instead seek to amalgamate and challenge, on behalf of a highly disparate class, a diverse array of alleged "practices." A brief canvass of their requested injunctive relief shows that much of it will provide no relief to a huge portion of the class, and some of the requested relief would create conflicts within the class. Most critically, plaintiffs' proposed injunction requiring ACS to more speedily move to terminate parental rights (A329) would harm those children who would like to be, and often are, reunited with their biological parents (A2928-29).

Plaintiffs' somewhat less disruptive forms of requested relief still fail to meet Rule 23(b)(2)'s requirements. For example, an order requiring that ACS not place a child with a Contract Agency unless the agency's case plans meet certain guidelines (A327), would provide no benefit for children who have or would be provided a sufficient case plan. Likewise, an order enjoining ACS from placing children at an agency that does not meet (plaintiffs' proposed) training requirements (*id.*), would provide no

benefit either to any child at another agency that did meet training requirements, or to any child who is placed with a sufficiently trained caseworker at the agency in question, or to any child who is not harmed by a caseworker whose training did not meet plaintiffs' unstated standards.

Even worse, some of the injunctive relief would create patent conflicts within the class. All plaintiffs' requests to enjoin ACS from placing children in agencies that don't meet plaintiffs' preferred requirements would affirmatively harm children who could not be placed until the requested judicial takeover of the foster-care system is complete and all plaintiffs' requested boxes are checked (A326-30). Some children would not prefer that even more caseworker time is spent on producing documentation and paperwork that, as the district court noted, "would necessarily detract from other key activities and priorities, such as helping families to obtain the services necessary to achieve reunification" (SPA18; *see also* A355-56).

Similarly, the requirement that ACS fund a costly special master and an expert panel would harm children who would prefer that the City's limited funds be spent on measures that would continue to improve

64

outcomes (*see* A430-32 (describing costs of monitors and explaining that "it is not uncommon for millions of dollars to be diverted from critical services to children to the mechanics of monitoring")). After all, "every dollar spent on a monitorship is a dollar that cannot be spent on other policy priorities."[17]

All members of a proposed Rule 23(b)(2) class "*must* stand to benefit" from injunctive relief. *Berni*, 964 F.3d at 147 n.28. Here, many, if not most, of the class's members would not benefit from the injunctive relief that plaintiffs request. Worse still, some would be actively harmed by the proposed relief. In those circumstances, class certification must be denied even if plaintiffs met the requirements of Rule 23(a).

## E. The district court did not err in failing to separately consider plaintiffs' proposed subclasses.

Finally, plaintiffs challenge the district court's decision not to separately analyze plaintiffs' proposed subclasses (App. Br. 61-63). Notably, they cite nothing suggesting that a failure to separately analyze proposed subclasses is error, particularly where the proposed subclasses

---

[17] U.S. Dep't of Justice, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees involving State and Local Governmental Entities* (Aug. 13, 2021), *available at* https://perma.cc/RW6V-MMN3

65

suffered from the exact same infirmities as the broader class. In the lone case on which they rely, commonality was not at issue, and this Court did not reverse the district court's certification decision for failing to consider subclasses, but for failing to "define the class" to exclude individuals with no viable claims, among other reasons. *Robidoux*, 987 F.2d at 937.

Fundamentally, plaintiffs bear the burden of showing that each subclass independently satisfies the elements of Rule 23. *See* Fed. R. Civ. P. 23(c)(5) (providing that each subclass must be treated "as a class under this rule"); *see also Marisol A.*, 126 F.3d at 378-79. Here, they do not even attempt to explain how the subclasses independently meet Rule 23's requirements (*see* App. Br. 61-63).

Moreover, the district court's commonality reasoning is equally applicable to the subclasses. Each member of the proposed subclasses is subject to the same system, and their case is influenced by the decisions of the same actors—the Contract Agencies, lawyers representing the children and parents, and the Family Court—that render the broader class uncommon. Nothing about the subclasses is distinct except for the particular policies they seek to challenge. The "special scrutiny" subclass is a class of children in care over two years, whose cases ACS policy

66

indicates should be given special scrutiny. But that is merely an aspirational agency goal not mandated by statute or otherwise. Dividing an uncommon class into a smaller class where discretionary agency best practices are allegedly not consistently applied does nothing to salvage commonality. Nor can a single injunction uniformly benefit this class as is required by Rule 23(b)(2).

Additionally, the proposed subclass of plaintiffs with inadequate documentation of a compelling reason for not filing a termination of parental rights does not meet Rule 23's requirements. Documentation of compelling reasons is required only for a subset of children in care for 15 of the last 22 months, and New York law has a broad, non-exhaustive definition of compelling reasons. N.Y. Soc. Serv. Law § 384-b(3)(l)(ii). Thus, establishing a violation requires consideration of whether the facts of a specific case will present a compelling reason not to file a petition even if not explicitly documented to plaintiffs' satisfaction. Moreover, Family Court justices at regular permanency hearings may order ACS to file a termination petition, and where they have not, it is reasonable to conclude that there were compelling reasons not to do so. Indeed, from 2012 to 2019, Family Court judges overwhelmingly found that ACS made

67

reasonable efforts toward permanency (A2931). Finally, for the reasons discussed above, there is an unmistakable conflict within the subclass, many of whose members were ultimately reunited with their families (A2928-29).

Despite criticizing the district court's lack of analysis as to the subclasses, plaintiffs themselves offered almost nothing before the district court to support the subclasses' certification. In their brief, they devoted no separate argument as to the propriety of the subclasses (*see generally* A660-73). They included named plaintiffs as class representatives for one of the subclasses who were not even proper *members* of the subclass (A3159-60). On reply, already too late, plaintiffs attempted to salvage their argument largely by adding the words "(and Subclasses)" to their argument headings (*see* A3254), but still failed to adduce any nonconclusory argument as to why the subclasses independently meet Rule 23's requirements (*see* A3265-88). The district court can hardly be faulted for declining to engage in an analysis of potential subclasses that plaintiffs themselves did not perform.

## CONCLUSION

The district court's order denying class certification should be affirmed.

Dated:  New York, NY
        July 19, 2022

Respectfully submitted,

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for City of New York

By:   /s/ Jamison Davies
      JAMISON DAVIES
      Assistant Corporation Counsel

      100 Church Street
      New York, NY 10007
      212-356-2490
      jdavies@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
JAMISON DAVIES
   *of Counsel*

69

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 13,841 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____/s/ Jamison Davies_____
JAMISON DAVIES